MARY ANN JAGGER *v.* MOHAWK MOUNTAIN
SKI AREA, INC., ET AL.
(SC 16895)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer,
Vertefeuille and Zarella, Js.[1]

---

[1] This case originally was argued before a panel of this court consisting of Chief Justice Sullivan and Justices Borden, Norcott, Katz and Palmer. Thereafter, the court, pursuant to Practice Book § 70-7 (b), ordered that the case be considered en banc. Accordingly, Justices Vertefeuille and Zarella were added to the panel, and they have read the record and briefs, and have listened to the tape recording of the oral argument.

Argued October 29, 2003—officially released June 22, 2004

*Andrew W. Bray*, with whom, on the brief, was *Lisa M. Gorham*, for the appellant (plaintiff).

*Philip T. Newbury, Jr.*, with whom, on the brief, was *Melanie A. Dillon*, for the appellees (defendants).

*Opinion*

NORCOTT, J. This case, which comes to this court upon our acceptance of two certified questions[2] from the United States District Court for the District of Connecticut pursuant to General Statutes § 51-199b (d),[3] asks us to consider whether, as a matter of Connecticut law, a skier may bring an action in negligence against a ski area operator and its employee arising out of a collision between the skier and the employee. More specifically, the certified questions require us to decide whether: (1) a skier, pursuant to General Statutes § 29-212,[4] has assumed the risk, as a hazard inherent in the

---

[2] The certified questions from the United States District Court for the District of Connecticut are: "1. Pursuant to [General Statutes] § 29-212, does a skier assume the risk of, and legal responsibility for, an injury arising out of a collision with a ski instructor, acting in the course of his employment with the ski area operator, when the collision is caused by the instructor's negligence?

"2. Does the fellow-participant immunity against liability for sports injuries caused by negligence recognized in *Jaworski* v. *Kiernan*, 241 Conn. 399, 696 A.2d 332 (1997), apply to collisions between a skier and a ski instructor caused by the instructor's negligence?" *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, United States District Court, Docket No. 3:01CV2163 (D. Conn. September 24, 2002).

[3] General Statutes § 51-199b (d) provides in relevant part: "The Supreme Court may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." See also Practice Book § 82-1.

[4] General Statutes § 29-212 provides: "Each skier shall assume the risk of and legal responsibility for any injury to his person or property arising out of the hazards inherent in the sport of skiing, unless the injury was proximately caused by the negligent operation of the ski area by the ski area operator, his agents or employees. Such hazards include, but are not limited to: (1) Variations in the terrain of the trail or slope which is marked in accordance with subdivision (3) of section 29-211 or variations in surface or subsurface snow or ice conditions, except that no skier assumes the risk of variations

sport of skiing, of a collision with a ski area employee, acting in the course of his employment with the ski area operator, thereby foreclosing a subsequent action for negligence against the operator and the employee; and (2) our decision in *Jaworski* v. *Kiernan*, 241 Conn. 399, 408–409, 696 A.2d 332 (1997), in which we concluded that coparticipants in team athletic contests involving contact as a part of the sport owe one another a duty to refrain from reckless or intentional conduct, should extend to the sport of skiing. We conclude that: (1) § 29-212 does not bar an action brought by a skier against a ski area operator alleging negligence by an employee of the operator; and (2) the doctrine articulated in *Jaworski* does not extend to the sport of skiing. Accordingly, under the circumstances of the present case, we answer both of the certified questions in the negative.

The following facts and procedural history, provided by the District Court in its certification request pursuant to Practice Book § 82-3,[5] guide our disposition of the certified questions. During the afternoon of December 4, 1999, the plaintiff, Mary Ann Jagger, a resident of the state of New York, was skiing an intermediate level trail on Mohawk Mountain, located in Cornwall, Connecticut. On that same afternoon, the defendant,

---

which are caused by the operator unless such variations are caused by snow making, snow grooming or rescue operations; (2) bare spots which do not require the closing of the trail or slope; (3) conspicuously marked lift towers; (4) trees or other objects not within the confines of the trail or slope; (5) boarding a passenger tramway without prior knowledge of proper loading and unloading procedures or without reading instructions concerning loading and unloading posted at the base of such passenger tramway or without asking for such instructions; and (6) collisions with any other person by any skier while skiing."

[5] Practice Book § 82-3 provides in relevant part: "A certification request shall set forth: (1) The questions of law to be answered; and (2) a finding or stipulation approved by the court setting forth all facts relevant to answering the questions certified and showing fully the nature of the controversy in which the questions arose. . . ."

Mohawk Mountain Ski Area, Inc. (Mohawk), a Connecticut corporation that operates Mohawk Mountain, was conducting a preseason ski clinic for its ski instructors, one of whom was the defendant James Courtot, a resident of the state of Connecticut.[6] As the two skiers negotiated the slopes, the plaintiff and Courtot collided, allegedly as a result of Courtot's failure to exercise reasonable care.

Subsequently, the plaintiff brought this federal diversity action sounding in negligence against the defendants.[7] The defendants thereafter moved to dismiss the complaint, claiming that the plaintiff's cause of action is: (1) barred by § 29-212, which provides that skiers "assume the risk of and legal responsibility for [injuries] . . . arising out of the hazards inherent in the sport of skiing . . . [including] collisions with any other person by any skier while skiing"; and (2) legally insufficient under our doctrine for coparticipant liability in team contact sports as articulated in *Jaworski* v. *Kiernan*, supra, 241 Conn. 408–409. The District Court reserved judgment on the defendants' motion and thereafter certified the questions of law to this court.

---

[6] During oral argument before this court, the defendants indicated that, although the ski instructors were not paid for their attendance at this preseason clinic, all instructors employed by Mohawk were expected to participate in the clinic as a condition of their employment. Moreover, we are mindful that the District Court has framed the certified questions in a manner that assumes, for the purposes of this certification, that Courtot was acting within the scope of his employment with Mohawk at the time of the collision. See footnote 2 of this opinion. Consequently, for the purposes of our analysis, we operate under the assumption that Courtot was acting within the scope of his employment at the time of the collision with the plaintiff.

[7] Count one of the plaintiff's complaint alleges that, because Courtot was acting within the scope of his employment at the time that he collided with the plaintiff, Mohawk is vicariously liable for the negligence of Courtot. This count also contains an allegation that Mohawk is liable for negligence based upon its failure to train and supervise Courtot properly. Count two of the complaint is brought against Courtot individually and alleges that his negligent conduct caused the collision with the plaintiff.

I

## ASSUMPTION OF RISK

The question as to whether a skier has assumed the risk of a collision with another skier while skiing presents an issue of first impression for this court. In support of her position that a skier may bring such a negligence action, the plaintiff claims that: (1) the negligent operation of a ski area, as the phrase is used in § 29-212, is not limited to the various duties of a ski area operator as enumerated in General Statutes § 29-211,[8] but rather includes any and all services offered by the ski area operator in the course of its business, including ski instruction and preseason ski clinics, and, accordingly, the operator may be liable in negligence for unreasonable conduct arising from those services; (2) the plain language and legislative history of § 29-212 demonstrate that, although skiers may not recover from a ski area operator for injuries arising out of inher-

---

[8] General Statutes § 29-211 provides: "In the operation of a passenger tramway or ski area, each operator shall have the obligation to perform certain duties including, but not limited to: (1) Conspicuously marking all trail maintenance vehicles and furnishing the vehicles with flashing or rotating lights which shall be operated whenever the vehicles are working or moving within the skiing area; (2) conspicuously marking the location of any hydrant or similar device used in snow-making operations and placed on a trail or slope; (3) conspicuously marking the entrance to each trail or slope with a symbol, adopted or approved by the National Ski Areas Association, which identifies the relative degree of difficulty of such trail or slope or warns that such trail or slope is closed; (4) conspicuously marking all lift towers within the confines of any trail or slope; (5) maintaining one or more trail boards at prominent locations within the ski area displaying such area's network of ski trails and slopes, designating each trail or slope in the same manner as in subdivision (3) and notifying each skier that the wearing of ski retention straps or other devices used to prevent runaway skis is required by this section, section 29-201 and sections 29-212 to 29-214, inclusive; (6) in the event maintenance men or equipment are being employed on any trail or slope during the hours at which such trail or slope is open to the public, conspicuously posting notice thereof at the entrance to such trail or slope; and (7) conspicuously marking trail or slope intersections."

ent hazards of the sport, skiers do not assume the risk of injuries associated with the negligent operation of the ski area; and (3) other jurisdictions with ski liability statutory schemes similar to that of Connecticut properly have drawn a distinction between collisions not caused in some manner by a ski area operator or its employees, for which an operator is not liable, and collisions somehow caused by the negligence of a operator or its employees, for which an operator may be liable.

In response, the defendants claim that: (1) the statutory exception in § 29-212, which provides that a skier assumes the risk of inherent hazards unless the injury was a result of the operator's negligence, is not implicated by the activities associated with ski instruction because ski instruction does not fall within the meaning of "operation of the ski area"; (2) the plain language of § 29-212 indicates that collisions with another skier are an inherent risk of the sport assumed by the skier and, therefore, the defendants are statutorily immune from liability as they owed the plaintiff no duty of care; (3) the legislative history surrounding this statutory scheme evinces a legislative intent to place the risk of all injuries arising from the inherent hazards of skiing, including collisions with other skiers, upon the individuals choosing to participate in the sport, while confining the potential liability of a ski area operator to the negligent performance of the various duties enumerated in § 29-211, and those functions of a similar nature; and (4) the defendants' position regarding the proper allocation of skiing risk enjoys persuasive support in several decisions of Connecticut trial courts, as well as from the courts of various other jurisdictions. We agree with the plaintiff, and we conclude that, on the basis of the relevant statutory text, legislative history and statutory purpose, as well as the instructive authority provided by other jurisdictions with similar statutory frameworks, a

skier does not assume the risk of a collision with another skier when such collision is caused by the negligence of a ski area operator, its agents or employees. Accordingly, we answer the first certified question in the negative.

We precede our analysis by setting forth the method by which we interpret statutes. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 586, 833 A.2d 908 (2003).

Both parties claim that the statute in question is plain and unambiguous. Public Acts 2003, No. 03-154, § 1, provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Thus, a threshold determination must be made as to the meaning of the statutory language at issue. See id. Because we determine that the language of the statute is not clear and unambiguous, we are not restricted to the text of the statute.

## A

### Whether Ski Instruction Is an Activity Falling Within the Operation of a Ski Area by a Ski Area Operator

At the outset, we recognize that the parties disagree as to the proper interpretation of the phrase "operation of the ski area by the ski area operator" as used in § 29-212. Our threshold inquiry, therefore, is whether a preseason clinic for ski instructors falls within the "operation of the ski area by the ski area operator . . . ." General Statutes § 29-212. The plaintiff claims that the operation of a ski area "encompasses any and all services offered by a ski area operator." Specifically, the plaintiff contends that once the decision has been made to provide certain services, all such services necessarily fall within the operation of the ski area. In response, the defendants claim that, since § 29-212 does not provide a definition of the phrase the "operation of the ski area," we should look to § 29-211 and its enumeration of certain duties that an operator is required to undertake for guidance regarding what constitutes an operation of the ski area. Specifically, the defendants contend that because the duties listed in § 29-211 all pertain to an operator's marking of various pieces of equipment and trails in order to provide skiers with notice as to their location and potential hazard, ski instruction, which is wholly dissimilar in nature to such duties, is not an activity associated with the "operation of the ski area" pursuant to § 29-212. We agree with the plaintiff and conclude that the "operation of the ski area by the ski area operator" in § 29-212 references those services offered by a ski area operator as components of its business activity, regardless of whether such services are statutorily or otherwise required.

Because § 29-212 does not define the phrase "operation of the ski area" or its operative terms, we turn to

other legislative enactments regarding the same subject matter for guidance. "Because the legislature is always presumed to have created a harmonious and consistent body of law, the proper construction of any statute must take into account the mandates of related statutes governing the same general subject matter." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 266 Conn. 108, 123, 830 A.2d 1121 (2003). As the parties point out, the phrase "in the operation of a . . . ski area" is also present in § 29-211. The use of almost identical phrases in adjoining statutes, which originally were enacted simultaneously, is indeed peculiarly persuasive evidence that the two phrases are synonymous. See 2B J. Sutherland, Statutory Construction (6th Ed. Singer 2000) § 51.01, p. 173; see also *Waterbury* v. *Washington,* 260 Conn. 506, 557, 800 A.2d 1102 (2002) ("[W]e read related statutes to form a consistent, rational whole, rather than to create irrational distinctions . . . . [S]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law . . . ." [Citations omitted; internal quotation marks omitted.]).

Section 29-211 sets forth certain duties that an operator is obliged to perform in its operation of a ski area. See footnote 8 of this opinion. We recognize that, contrary to the suggestion of the defendants, the enumerated activities contained within § 29-211 are not illustrative of the "operations" but rather of the "duties" required of a ski area operator. "In the *operation* of a . . . ski area, each operator shall have the obligation to perform certain *duties* including . . . ." (Emphasis added.) General Statutes § 29-211. Thus, the fact that these activities are "duties" and not "operations" does little to guide our interpretation of the phrase "operation of the ski area" beyond merely indicating that an operator's duties are a subset of its operations.

Without sufficient guidance provided by § 29-212, or by the various statutes regarding related subject matter, to discern the meaning of the phrase the "operation of the ski area," we look to the words ordinary meaning. "To ascertain the commonly approved usage of a word, it is appropriate to look to the dictionary definition of the term." (Internal quotation marks omitted.) *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 41 n.13, 787 A.2d 541 (2002). Webster's Third New International Dictionary defines the word "operation," inter alia, as "the whole process of planning for and operating a business or other organized unit," and as "a phase of a business or of business activity . . . ." This dictionary definition is consonant with the plaintiff's interpretation of the phrase as including those services provided by a ski area operator in connection with its business.

Furthermore, as will be discussed subsequently in part I B of this opinion, the legislative history and underlying legislative purpose of § 29-212 support our interpretation of the phrase "operation of the ski area by the ski area operator" as those services provided by an operator in the course of its business. A review of the relevant legislative history demonstrates that the primary purpose behind our legislature's enactment of § 29-212 was to set out the respective responsibilities of the ski area operator and the skier. More specifically, our legislature intended to make clear that skiers, by participating in the sport of skiing, assume the risk of those hazards inherent in the sport of skiing over which a ski area operator has no control. At the same time, the legislative history surrounding § 29-212 demonstrates that our legislature also intended to impose upon ski area operators a duty to act reasonably and to minimize the potential for injury with regard to those hazards that are within the ski area operator's sphere of control. As such, our interpretation of the phrase "operation of the ski area" in § 29-212 as referring to those

services offered, and activities engaged in, by a ski area operator as a component of its business activity is in harmony with this legislative intent to require that ski area operators act reasonably within their sphere of control. The services and activities of a ski area operator in connection with its business necessarily will be within the control of a ski area operator. We, therefore, reject the defendants' claim that the relevant activity of the defendants in this matter does not implicate the provision of § 29-212 that allows an action for the negligent operation of a ski area.

B

Whether a Skier Assumes the Risk of a
Collision With a Ski Instructor

Having concluded that a preseason clinic for instructors constitutes an activity associated with the operation of a ski area, we turn to the interpretation of § 29-212 in order to determine whether a skier, by participating in the sport of skiing, has assumed the risk of collision with a ski instructor. After a thorough review, we conclude that the most reasonable interpretation of § 29-212 is that a skier has not assumed the risk of injury associated with the sport of skiing when such risk negligently has been created by a ski area operator or when, in the exercise of due care, the operator could have taken steps to minimize such a risk and unreasonably failed to do so.

Our inquiry necessarily begins, as always, with the relevant statutory text. Section 29-212 provides that "[e]ach skier shall assume the risk of and legal responsibility for any injury to his person . . . arising out of the hazards inherent in the sport of skiing, unless the injury was proximately caused by the negligent operation of the ski area by the ski area operator, his agents or employees. Such hazards include, but are not limited

to . . . collisions with any other person by any skier while skiing." See footnote 4 of this opinion.

We recognize preliminarily the statutory progression of § 29-212. Section 29-212 first indicates that a skier assumes the risk of injury arising out of the hazards inherent in the sport. Subsequently, however, § 29-212 provides that those risks are not assumed when "the injury was proximately caused by the negligent operation of the ski area by the ski area operator, his agents or employees." On its face, therefore, the statute invokes the doctrine of assumption of risk for the inherent hazards associated with skiing, placing the burden of such hazards upon voluntary participants in the sport, yet creates an exception for injuries arising out of the negligent operation of the ski area by the operator.[9]

Traditionally, the doctrine of assumption of risk provided a defendant with a complete defense to a claim of negligence that centered upon the conduct of the plaintiff; namely, that it was the plaintiff's assumption of a certain risk that subsequently caused an injury. A review of the application of this doctrine[10] indicates

---

[9] This shifting construct apparently was within the design of the statute's legislative proponents. In the House debates regarding the proposed legislation, Representative Rosalind Berman stated: "Basically . . . [skiing] is a dangerous sport. When you get out there on those [slopes], [you are] pretty much skiing at your own risk. And, so . . . [§ 29-211] . . . specifie[s] . . . what it is a ski operator has to do. . . . And [in § 29-212] . . . where you have assumption of risk . . . which said basically if you go out skiing . . . that you will bear the responsibility . . . . *[So] what [§ 29-212] says is you assume the risk on the one hand, then it pulls the horns right back in and says . . . unless the injury was proximately caused by the negligent operat[ion] of the ski area.*" (Emphasis added.) 22 H.R. Proc., Pt. 36, 1979 Sess., pp. 12,683–84.

[10] This doctrine has been imbued with no small amount of confusion, much of which stems from the rather consistent use of the phrase "assumption of risk" to refer imprecisely to a wide variety of conceptual variants of the doctrine without recognition of the existence of such variants and without adequate distinguishing analysis. See W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 68, p. 480. In an attempt to stem this continued misuse of the phrase in broad reference to a number of distinct concepts, several commentators have conducted a review of the doctrine's application and have compartmentalized the distinct variants.

that the assumption of risk variants fall generally within

One such group of commentators has divided the doctrine into two relatively broad categories. The first category, labeled assumption of risk in the primary sense, precludes a plaintiff from recovery because a defendant did not owe the plaintiff a duty of care with regard to a certain risk and cannot be liable in tort for failing to do that which the defendant was not required to do. 4 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 21.0, pp. 188–89. The second category, labeled secondary assumption of risk, precludes a plaintiff from recovery, despite a defendant's breach of an owed duty of care to that plaintiff, because the plaintiff knowingly encountered the risk of injury caused by the defendant's negligence. Id., p. 189. In both instances, the doctrine forecloses a plaintiff's recovery but does so in very different ways; primary assumption of risk forecloses liability because the defendant had no duty, while secondary assumption of risk concedes a defendant's duty and breach, but bars recovery as the plaintiff was aware of the risk and chose to encounter it, severing the defendant's liability as a matter of law.

The Restatement (Second) of Torts divides the doctrine of assumption of risk more narrowly into four different concepts: (1) express assumption of risk for instances in which a plaintiff expressly consents to relieve a defendant of a duty to exercise due care toward the plaintiff, thereby releasing the defendant from any such duty; (2) implied assumption of risk in an instance in which a plaintiff voluntarily enters into a relationship with a defendant that the plaintiff knows involves the potential of a certain risk, thereby tacitly relieving the defendant of responsibility; (3) implied assumption of risk in an instance in which the plaintiff is aware of a risk that has been created by the negligence of a defendant, but nevertheless voluntarily chooses to encounter the risk; and (4) implied assumption of risk in an instance in which a plaintiff voluntarily, but unreasonably, encounters a known risk and may not recover, despite the defendant's negligence, because of the plaintiff's own implied consent to accept the risk and the contributory negligence in so doing. 2 Restatement (Second), Torts § 496 A, pp. 561–62, comment (c) (1965).

Another group of commentators instead have categorized the variant assumption of risk concepts into three "perspectives": (1) an express consent perspective in which a plaintiff gives explicit consent to relieve the defendant of a duty to protect the plaintiff and thereby accepts the chances of encountering a known risk; (2) a duty perspective in which a plaintiff voluntarily enters into a relationship with a defendant with knowledge that the defendant will not protect the plaintiff from future risks associated with the relationship; and (3) a misconduct defense perspective in which a plaintiff is aware of the defendant's negligent creation of a certain risk, yet nevertheless chooses to encounter it. W. Prosser & W. Keeton, supra, § 68, pp. 480–81. Although recognizing that a plaintiff's assumption of risk in these situations could be eminently reasonable as, for instance, in situations in which the possible reward justifies the risk taken, these commentators also recognize

two separate categories: (1) a negligence defense that the plaintiff's conduct operated so as to relieve the defendant of a duty of care with regard to the plaintiff;[11] and (2) a negligence defense that, while conceding that the defendant owed the plaintiff a duty of care and breached that duty, precludes recovery by the plaintiff because the plaintiff was aware of the defendant's negligence and the risk thereby created, but nevertheless chose to confront such risk.[12]

At first blush, neither of these categories fits comfortably within the doctrine of assumption of risk as it is employed in § 29-212. Specifically, with regard to the first category of the doctrine; that the defendant did not owe the plaintiff any duty of care; the progression of § 29-212, providing that a skier assumes the risk inherent in the sport *unless* caused by a ski operator's negligent operation, does not appear to correspond because, by definition, in this category the ski area operator has been relieved of its duty of care toward

that the choice to encounter a certain risk also could be unreasonable; in this situation, the plaintiff's conduct, and the subsequent bar on recovery for injuries arising from the risk, is comparable to the doctrine of contributory negligence, which operates to foreclose recovery for harm the cause of which was at least partially the creation of the plaintiff; id., p. 481; or comparative negligence in which the liability of a defendant may be impacted by the conduct of the plaintiff. Id., p. 495.

[11] This category would include: the first category of the Harper, James and Gray formulation; 4 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 21.0, pp. 188–89; concepts (1) and (2) of the Restatement (Second) formulation; 2 Restatement (Second), Torts § 496 A, pp. 561–62, comment (c) (1965); and perspectives (1) and (2) of the Prosser and Keeton formulation. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 68, pp. 480–81; see footnote 10 of this opinion.

[12] This category would include: the second category of the Harper, James and Gray formulation; 4 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 21.0, pp. 188–89; concepts (3) and (4) of the Restatement (Second) formulation; 2 Restatement (Second), Torts § 496 A, pp. 561–62, comment (c) (1965); and perspective (3) of the Prosser and Keeton formulation. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 68, pp. 480–81; see footnote 10 of this opinion.

the skier and, in the absence of a duty to protect the plaintiff, there can be no negligence.[13] Similarly, the use of assumption of risk in § 29-212 does not coincide with the second category insofar as that variant already presumes negligence on the part of the defendant, but nevertheless disallows recovery because the plaintiff voluntarily chose to encounter the known risk.

Notwithstanding this analytical morass, closer analysis of the statute reveals that § 29-212 provides that a skier assumes the risk of those hazards over which an operator has no control or over which an operator cannot reasonably act so as to ameliorate the potentiality of harm—for such hazards a skier has assumed the risk in the primary sense and an operator has no duty to protect skiers with regard to such hazards. See footnote 10 of this opinion. Over those risks which an operator has control, or over which an operator can act reasonably so as to minimize the existence or level of risk, however, an operator owes skiers a duty of care and breach of that duty subjects the operator to liability in negligence under our settled principles of comparative negligence.

This interpretation is supported by the legal landscape within which § 29-212 was enacted. For the purposes of the requisite standard of care, skiers entering the premises of a ski area operator in order to participate in the sport of skiing properly are considered to be invitees of the operator. See 2 Restatement (Second), Torts § 332, p. 176, comment (a) (1965) ("[invitees] fall generally into two classes: [1] those who enter as members of the public for a purpose for which the land is

---

[13] "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *LePage* v. *Horne*, 262 Conn. 116, 123, 809 A.2d 505 (2002). Thus, "[t]here can be no actionable negligence . . . unless there exists a cognizable duty of care." *Waters* v. *Autuori*, 236 Conn. 820, 826, 676 A.2d 357 (1996).

held open to the public; and [2] those who enter for a purpose connected with the business of the possessor"). A ski area operator generally owes skiers, as invitees, an affirmative duty to protect them not only from the dangers of which the operator is aware, but also against those dangers the operator might discover with reasonable inspection. See W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 61, pp. 419–28.

As a result of this standard of care, the doctrine of assumption of risk was infused judicially in order to shield ski area operators from liability arising from the innate danger of the sport. The most authoritative application of this doctrine to the issue of ski liability was *Wright* v. *Mt. Mansfield Lift, Inc.*, 96 F. Sup. 786, 787, 792 (D. Vt. 1951), in which the United States District Court for the District of Vermont, applying Vermont state law, directed a verdict for the defendants in a negligence action alleging injury as a result of a collision between a plaintiff and a snow-covered tree stump hidden from view on a marked ski trail. The District Court concluded that "[o]ne who takes part in . . . a sport accepts the dangers that inhere in it so far as they are obvious and necessary. . . . [Accordingly, the plaintiff] assumed the risk." (Citations omitted.) Id., 791.

The District Court went on to state that "[i]n this . . . case, there is no evidence of any dangers existing which reasonable prudence on the parts of the defendants would have foreseen and corrected. It isn't as though a tractor was parked on a ski trail around a corner or bend without warning to skiers coming down. It isn't as though on a trail that was open work was in progress of which the skier was unwarned. It isn't as though a telephone wire had fallen across the ski trail of which the defendant knew or ought to have known and the plaintiff did not know. The trail at the point of the accident was smooth and covered with snow. There were no unexpected obstructions showing. The plain-

tiff, in hitting the snow-covered stump as she claims to have hit, was merely accepting a danger that inheres in the sport of skiing." Id.

Thus, as an inherent risk, a collision with the snow-covered stump could not provide the basis for an action in negligence against the defendants. Id. Accordingly, the predicate of *Wright* was a distinction drawn between inherent risks, such as a snow-covered tree stump, which a skier impliedly assumes by participating in the sport, and hazards, such as tractors parked on a ski trail, which were created or unreasonably allowed to remain by the operator and for which liability could attach.

The doctrine of assumption of risk applied to actions involving ski-related accidents until the decision of the Vermont Supreme Court in *Sunday* v. *Stratton Corp.*, 136 Vt. 293, 390 A.2d 398 (1978). In *Sunday*, the plaintiff, a novice skier, was severely injured after becoming entangled in a clump of brush located a short distance from the outer edge of the ski trail and concealed by loose snow. Id., 297–98. The Vermont Supreme Court affirmed a judgment rendered following a jury verdict that awarded the plaintiff $1.5 million in damages. Id., 297. In so doing, the court recognized that the "general principle" of *Wright*, namely, "that a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary" had gained "wide acceptance"; id., 299; but went on to conclude that, in light of modern grooming techniques for ski trails, it could no longer be said that concealed brush, especially located in a novice trail, was an inherent danger which the plaintiff had assumed the risk of confronting by participating in the sport of skiing. Id., 300.

As such, the court in *Sunday* did not disagree with the distinction drawn in *Wright* between inherent haz-

ards and hazards within the control of a ski area operator; it merely reclassified, in light of the modern technology available to an operator, those risks within the control of the operator. "The claim [here] is that the brush was an inherent danger of the sport. This is the equivalent of, and better put as, a claim that [the] defendant owed [the] plaintiff no duty with respect thereto, sometimes referred to as primary assumption of risk. . . . Where primary assumption of risk exists, there is no liability to the plaintiff, because there is no negligence on the part of the defendant to begin with; the danger to [the] plaintiff is not one which [the] defendant is required to extinguish or warn about; having no duty to begin with, there is no breach of duty to constitute negligence." (Citations omitted; internal quotation marks omitted.) Id., 301. "While skiers fall, as a matter of common knowledge, that does not make every fall a danger inherent in the sport. If the fall is due to no breach of duty on the part of the defendant, its risk is assumed in the primary sense, and there can be no recovery. But where the evidence indicates existence or assumption of duty and its breach, that risk is not one 'assumed' by the plaintiff. What he then 'assumes' is not the risk of injury, but the use of reasonable care on the part of the defendant." Id., 302.

Following the *Sunday* decision, ski area operators across the country, including those in Connecticut, became concerned with what they perceived to be a shift in their potential tort liability and the concomitant uncertainty regarding the various responsibilities of a ski area operator.[14] In response, in 1979, our legislature

---

[14] Senator Lawrence J. DeNardis, during Senate debates on the issue, stated: "We are talking in economic terms of no small industry here in the State of Connecticut, one that is growing and shows great promise . . . and the fact that liability insurance has risen dramatically . . . has been an ominous cloud over the growth and further expansion of that industry . . . and I might add for the record that concern for this emanates from a major decision which was handed down in Vermont a couple of years ago . . . which shocked the ski world . . . ." 22 S. Proc., Pt. 15, 1979 Sess., p. 4884.

undertook consideration of Substitute Senate Bill No. 1123, which was entitled, "An Act Concerning the Responsibilities and Liabilities of Skiers and Ski Area Operators."[15] In reviewing this history, it is clear to us that the legislature intended to preclude ski area operator liability for injuries arising out of inherent risks of the sport, while at the same time allowing claims sounding in negligence arising out of the risks that are preventable by the ski area operator. See 22 H.R. Proc., Pt. 36, 1979 Sess., pp. 12,666–67, remarks of Representative Alfred J. Onorato ("When a [skier] goes on a ski trip . . . and is injured for one reason or another, there must be some kind of fault or some kind of negligence on the part of the operator, and . . . under the comparative negligence section, a lesser degree of fault or no fault, on the part of the [skier]. . . . [T]hat type of situation, [however] does not take into regard any of the variables that one would find on the ski slopes. . . . [This bill] states that there are certain inherent risks to skiing . . . [that] are a part of the risks one takes when one takes to the mountains. . . . [I]f a person was injured as [a result of these inherent hazards] then the operator would not be liable."). In addition, the legislative history reveals that our legislature intended that an operator would be liable if it failed to act reasonably with regard to conditions within its control. See id., p. 12,667 (indicating that bill "does not say that the operator would not be liable if the operator showed any kind of negligence"); id., pp. 12,669–70 ("[I]t is fair to the general public and to the skier . . . that the skier can still maintain [a claim] of negligence against the [operator] of a ski slope for negligence caused by the operator . . . . [The bill merely]

---

[15] The legislature also considered a separate bill during the same legislative session, Proposed Senate Bill No. 1188, which was entitled, "An Act Concerning Ski Area Safety and Liability." This proposal was subsequently incorporated into Substitute Senate Bill No. 1123.

reliev[es] the [operator] of [liability for] acts that are beyond his control.").

This legislative history, combined with the text of § 29-212 and the *Wright* and *Sunday* decisions, leads us to the conclusion that, pursuant to § 29-212, a skier has assumed the risk of hazards inherent in the sport of skiing; namely, those hazards that are beyond the control of the ski area operator and cannot be minimized by the operator's exercise of reasonable care. For those risks that are within the sphere of control of the ski area operator, and that may be minimized or eliminated with reasonable practicality, the operator owes a duty of due care and may be held liable in tort should that duty be breached and proximately cause injury to a skier.[16]

---

[16] As indicated; see footnote 7 of this opinion; the plaintiff has brought two separate claims against Mohawk: first, that Mohawk is liable directly for its negligence in failing to train and supervise Courtot properly; and, second, that Mohawk is liable vicariously for the negligence of its employee, Courtot. Both of these claims allege negligence on the part of Mohawk in connection with the operation of its ski area, for which, pursuant to § 29-212, it may be found liable. With regard to the claim of direct liability, a claim that Mohawk has failed to train or supervise an employee is necessarily a claim that it has failed to act reasonably so as to minimize risks that are within its control. As risks within the control of Mohawk, improper training and supervision of ski area employees are not hazards inherent in the sport of skiing and, should the plaintiff meet her burden of demonstrating negligence, Mohawk may be found directly liable pursuant to § 29-212.

On the issue of vicarious liability, we reiterate that, for the purposes of answering these certified questions, we assume that Courtot was acting within the scope of his employment at the time of the collision with the plaintiff. See footnotes 2 and 6 of this opinion. As such, we operate under the assumption that Courtot's conduct: (1) occurred primarily within Mohawk's authorized time and space limits for its employees; (2) was of the type that he was employed to perform; and (3) was motivated, at least partially, by a purpose to serve Mohawk. See *Harp* v. *King*, 266 Conn. 747, 782–83, 835 A.2d 953 (2003) (citing 1 Restatement [Second], Agency § 228, p. 504 [1958]).

We previously have stated that "[v]icarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of public policy that one person should be liable for the act of [another]. Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." (Internal quotation marks omitted.) *Pel-*

The plain language of § 29-212 itself buttresses this interpretation.[17] Section 29-212 provides, as a nonex-

*letier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 528 n.12, 825 A.2d 72 (2003).

Underlying this justification, however, commentators have noted that vicarious liability is premised upon "the general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss." W. Prosser & W. Keeton, supra, § 69, p. 500. Put differently, a fundamental premise underlying the theory of vicarious liability is that an employer exerts control, fictional or not, over an employee acting within the scope of employment, and therefore may be held responsible for the wrongs of that employee. Id. ("[the employer] has a more or less fictitious 'control' over the behavior of the [employee and] . . . has 'set the whole thing in motion,' and is therefore responsible for what has happened"); 1 Restatement (Second), Agency, supra, § 2, p. 12 ("[1] A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service. [2] A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master."). It is as a result of this control that the theory of vicarious liability allows employers to be subject to liability for the physical harm caused by the negligent conduct of their employees acting within the scope of employment. 1 Restatement (Second), Agency, supra, § 243, p. 536.

Here, the theory of vicarious liability, premised upon the notion of actual or fictional control by an employer, meshes perfectly with our interpretation of § 29-212. As discussed, pursuant to § 29-212, a ski area operator may be held liable in tort for failing to act reasonably with regard to risks within its sphere of control. An employee acting within the scope of employment, pursuant to our well settled standard of vicarious liability, is presumed to be under the control of the employer. Consequently, if an employee of a ski area operator fails to exercise reasonable care within the scope of employment, the ski area operator may be held liable under the theory of vicarious liability because the operator is presumed to have control over the conduct of the employee and, notwithstanding the fact that the operator itself did not act negligently, may be held accountable. Beyond this, we further note that the legislative history surrounding § 29-212 is devoid of any indication of legislative intent to remove ski area operators from the ambit of traditional notions of vicarious liability. Compare General Statutes § 52-557n (a) (2) ("[e]xcept as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: [A] [a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct"). In the absence of an indication of legislative intent to do so, we will not read the statutory scheme in a manner achieving such a result.

[17] The common meaning of the word "inherent" also supports our interpretation of § 29-212 that the statute provides that a ski area operator is bound by a duty to exercise reasonable care within its area of control, while the

haustive enumeration, six examples of risks "inherent in the sport of skiing . . . ." See footnote 4 of this opinion. The common thread throughout these examples is that they are either a risk over which an operator has no realistic control—for instance, terrain variations not caused by the operator; General Statutes § 29-212 (1); or risks over which the operator has done all that is reasonably required to do to protect skiers—for instance, the conspicuous marking of lift towers to afford notice to skiers of their presence. General Statutes § 29-212 (3).[18]

Our interpretation also is consistent with that of the Utah Supreme Court in *Clover* v. *Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991). Utah has a statutory scheme markedly similar to our legislative enactments regarding ski liability. In particular, Utah's scheme defines the inherent risks of skiing as "those dangers or conditions which are an integral part of the [sport] of skiing . . . including, but not limited to . . . collisions with other skiers . . . ." Utah Code Ann. § 78-27-52 (1) (2002). Further, the scheme provides that "no skier may make any claim against, or recover from, any ski area operator

inherent risks of skiing—those hazards over which an operator has no control—are assumed by skiers. Webster's Third New International Dictionary defines "inherent" as, among other things, "structural or involved in the constitution or essential character of something . . . ." Similarly, the Oxford English Dictionary (2d Ed. 1989) defines the word as "[e]xisting in something as a permanent attribute or quality . . . ."

[18] We are aware that, even for those risks enumerated as inherent pursuant to § 29-212, there still exists the possibility of operator negligence. This possibility is confirmed by the explicit text of § 29-212, which indicates that a skier assumes inherent risks, unless caused by the negligent operation of the ski area by the operator. For example, if an operator conspicuously marks its lift tower as required in § 29-212 (3), the operator will have done generally all that it is reasonable for it to do. If, however, the operator places that conspicuously marked lift tower on a trail in such a manner that makes it highly dangerous for skiers, the operator could be liable for negligent operation in the placement of the tower. In that scenario, while the marked tower is an inherent hazard pursuant to § 29-212 (3), the negligent placement by the operator would allow recovery.

for injury resulting from any of the inherent risks of skiing." Utah Code Ann. § 78-27-53 (2002).

In *Clover*, the plaintiff brought an action in negligence against a ski area operator and its employee, alleging that the employee, acting in the course of his employment, collided with the plaintiff and caused her injury. *Clover* v. *Snowbird Ski Resort*, supra, 808 P.2d 1038–39. The trial court granted summary judgment in favor of the defendants, concluding that, pursuant to § 78-27-52, the plaintiff was injured as a result of an inherent risk of the sport; namely, a collision with another skier or a fall resulting from a variation in terrain. Id., 1043.

On appeal, the Utah Supreme Court recognized that § 78-27-52 could be read in a manner so as to define all skier collisions as inherent risks, but the court refused to do so. Id., 1044. Rather, the court in *Clover* concluded that "[t]he inherent risks of skiing are those dangers that skiers wish to confront as essential characteristics of the sport of skiing or hazards that cannot be eliminated by the exercise of ordinary care on the part of the ski area operator." Id., 1046–47. The premise of this decision was the Utah Supreme Court's view that "the ordinary and accepted meaning of the term 'inherent,' refers to those risks that are essential characteristics of skiing—risks that are so integrally related to skiing that the sport cannot be undertaken without confronting these risks. . . . In fact, if an injury was caused by an unnecessary hazard that could have been eliminated by the use of ordinary care, such a hazard is not, in the ordinary sense of the term, an inherent risk of skiing . . . ." Id., 1047. On the basis of this definition of "inherent," the Utah Supreme Court concluded that a blind jump with a landing area located at the same point at which skiers enter the trail was not an essential characteristic of an intermediate trail and that a genuine issue of material fact, precluding summary judgment, existed as to whether the operator could have prevented

the accident by the exercise of reasonable care. Id., 1048.

We agree with the analysis of the Utah Supreme Court. Thus, for inherent hazards, ski area operators owe skiers no duty of care and skiers assume the risk of those hazards in the primary sense. For those hazards which are not an innate part of the sport of skiing, or over which an operator can act reasonably to eliminate or minimize the potential for harm, operators owe skiers a duty of reasonable care.[19]

On the basis of this analysis, we conclude that the negligence of an employee or agent of a ski area operator is not an inherent hazard of the sport of skiing.[20]

[19] At oral argument before this court, the defendants conceded that ski area operators must act reasonably within their sphere or control and, if they are negligent in doing so, they may be liable. Specifically, in response to a hypothetical posited by the court, the defendants conceded that in a situation in which a ski area operator hired a ski instructor without sufficient inquiry into such instructor's qualifications or fitness for the position, or if an operator negligently failed to supervise or train an instructor, the operator would have potential liability in tort should the instructor proximately cause harm to another. Foundationally, this concession is a recognition that a ski area operator has a duty to act with reasonable care for those activities under the control of the operator.

[20] We are not persuaded by the defendants' reliance upon the jurisdictions of Pennsylvania, California and New Hampshire in support of their position. Specifically, the defendants rely upon *Hughes* v. *Seven Springs Farm, Inc.*, 563 Pa. 501, 502–503, 511–12, 762 A.2d 339 (2000), to claim that collisions between skiers allegedly caused by the negligence of a ski area operator are an inherent risk of the sport assumed by skiers. In *Hughes*, however, the Pennsylvania Supreme Court was engaged in the interpretation of a ski liability statute; 42 Pa. Cons. Stat. Ann. § 7102 (c) (West 1998); that invoked the doctrine of assumption of risk without making exception for injuries caused by the negligent operation of the ski area by the operator, which is in material contrast to § 29-212. Moreover, we note that, in *Hughes*, the plaintiff did no more to show negligence on the part of the operator than demonstrate that the collision with the other skier took place on the operator's slopes. *Hughes* v. *Seven Springs Farm, Inc.*, supra, 511–12. Thus, *Hughes* did not involve a claim of negligent operation of a ski area.

Nor are we persuaded by the defendants' reliance upon *Cheong* v. *Antablin*, 16 Cal. 4th 1063, 1069, 946 P.2d 817, 68 Cal. Rptr. 859 (1997) (concluding that county ordinance providing that skier assumes risk of collision with another skier bars negligence action by one skier against

Accordingly, the plaintiff's claim against Mohawk is not statutorily barred by § 29-212, and the plaintiff may maintain an action in negligence against Mohawk in accordance with our well settled principles of comparative negligence.[21]

another skier arising out of collision), and *Connelly* v. *Mammoth Mountain Ski Area*, 39 Cal. App. 4th 8, 12, 45 Cal. Rptr. 2d 855 (1995) (concluding that hazard presented by allegedly inadequately padded lift tower was inherent risk of sport assumed by skier). *Cheong* is inapposite to this matter as it involved an action brought against a fellow skier, not a ski area operator, and involved an ordinance that did not explicitly allow for an action arising out of the negligent operation of a ski area. *Cheong* v. *Antablin*, supra, 1069. In *Connelly*, the court indicated that, because a ski area operator had no duty to pad its lift towers, it would be inappropriate to hold an operator liable in negligence for inadequately padding its towers. *Connelly* v. *Mammoth Mountain Ski Area*, supra, 12–13. This lack of duty with regard to padding distinguishes *Connelly* from the posture of the present case in which, pursuant to § 29-212, a ski area operator has a duty to refrain from negligent conduct in connection with the operation of the ski area.

Finally, the defendants rely upon *Rayeski* v. *Gunstock Area/Gunstock Area Commission*, 146 N.H. 495, 776 A.2d 1265 (2001). New Hampshire law provides that: ski area operators must perform certain acts, including the posting of warnings and notices to skiers regarding potential hazards; N.H. Rev. Stat. Ann. § 225-A:23 (2000); skiers assume the risk of inherent hazards of the sport; N.H. Rev. Stat. Ann. § 225-A:24 (2000); and an operator may not be liable in negligence unless the operator violates either the express duties set forth in the chapter or unless the negligence was in connection with the "operation, construction or maintenance of the passenger tramway itself." N.H. Rev. Stat. Ann. § 225-A:25 (I) (2000). In *Rayeski* v. *Gunstock Area/Gunstock Area Commission*, supra, 498, the New Hampshire Supreme Court concluded that light poles on a ski slope were an inherent hazard of the sport of skiing and that the plaintiff's claim arising out of a collision with such a pole was barred by § 225-A:24. The *Rayeski* decision carries little relevance to the present case. We note that, under New Hampshire law, the relevant statutory scheme regarding the liability of ski area operators expressly circumscribes potential liability for negligence to violations of the statutorily-enumerated duties of an operator or to negligent operation of an operator's passenger tramway. N.H. Rev. Stat. Ann. § 225-A:25 (I) (2000). In contrast to such narrow potential liability, § 29-212 instead provides that an action may be maintained against a ski area operator if there has been "negligent operation of the ski area . . . ."

[21] We also are aware that the plaintiff has brought a claim of negligence against Courtot in his individual capacity. See footnote 7 of this opinion. The breadth of the first question certified for our review; see footnote 2 of this opinion; also requires us to decide whether a skier assumes the risk,

## II

## WHETHER THE STANDARD OF CARE IMPLICATED BY THE SPORT OF SKIING PRECLUDES NEGLIGENCE LIABILITY FOR COPARTICIPANTS

The second certified question requires us to consider whether our decision in *Jaworski* v. *Kiernan*, supra, 241 Conn. 408–409, in which we concluded that coparticipants in a team athletic contest involving contact as a part of the game owe one another a duty merely to refrain from reckless or intentional misconduct, should be extended to the sport of skiing. We conclude that the standard of care implicated in the context of the sport of skiing is that of a duty to refrain from unreasonable conduct and that liability may attach for negligent behavior. Accordingly, we answer the second certified question in the negative.

pursuant to § 29-212, of a collision with another skier such that a negligence action against that skier is foreclosed. Although the question as to the applicability of § 29-212 in actions between skiers presents an issue of first impression for this court, we are aware of conflicting authority from Connecticut trial courts. Compare *Hopkins* v. *Obermeyer*, Superior Court, judicial district of Tolland, Docket No. CV99 0076715S (January 9, 2002) (31 Conn. L. Rptr. 226) (concluding that reach of § 29-212 extends to negligence actions between skiers and that statute bars action arising out of inherent risk of collision with another skier) with *Trinkaus* v. *Mohawk Mountain Ski Area*, Superior Court, judicial district of Derby, Docket No. CV02 0078510S (June 6, 2003) (concluding that, being within statutory scheme designed to regulate relationship between skiers and ski area operators, § 29-212 is inapplicable to negligence actions between skiers). We conclude that § 29-212 is not implicated in the context of a negligence action between skiers. As the legislative history of this statutory scheme demonstrates, the intent of § 29-212 was to clarify the relationship between skier and ski area operator with regard to the risks assumed by a skier by participating in the sport and the duties owed to skiers by the operator. This legislative history is devoid of reference to the intended application of § 29-212 to actions between skiers. Indeed, it would be anomalous for § 29-212 to provide expressly that an action for negligent operation may be maintained against an operator but to bar any negligence action against a fellow skier.

Before this court, the plaintiff claims that: (1) our decision in *Jaworski*, dealing with team athletic contests in which contact is an integral part of the sport, is inapplicable to the sport of skiing, a noncontact sport akin to the sport of golf, in which the standard of negligence applies; (2) even if this court is inclined to extend the principles of *Jaworski* to the context of skiing, we are foreclosed statutorily from doing so insofar as § 29-212 evinces a clear legislative intent to apply the standard of negligence to the sport of skiing; and (3) in other jurisdictions that have abandoned a distinction between contact and noncontact sports with regard to the standard of care owed to coparticipants, negligence remains the standard in the context of skiing. In response, the defendants claim that, although skiing is not a team sport, contact between skiers is a part of the sport and has been recognized as an "inherent [hazard]" of the sport by our legislature. The defendants also claim that, even if skiing is to be considered a noncontact sport, this court should follow the lead of those jurisdictions that have applied a standard of recklessness or intentional misconduct within the context of the sport of skiing. Finally, the defendants contend that, once the doctrine of *Jaworski* is applied, an action against Courtot should be precluded as the doctrine makes no exception for coparticipants who are acting within the course of their employment at the time of their allegedly improper conduct. We conclude that the doctrine articulated in *Jaworski* should not be extended to the sport of skiing.

In *Jaworski* v. *Kiernan*, supra, 241 Conn. 400–401, the plaintiff, injured by a coparticipant during an outdoor adult coed soccer game, brought an action alleging, inter alia, negligence on the part of the coparticipant. In analyzing whether a duty exists between coparticipants in a soccer game, and if so, to what extent that duty extends, we stated: "[O]ur

threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . [T]he test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . . A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed." (Citations omitted; internal quotation marks omitted.) Id., 405–406.

In *Jaworski*, we first concluded that the plaintiff's injury was a foreseeable consequence of the defendant's actions because soccer is a sport "replete with occasions when the participants make contact with one another during the normal course of the game." Id., 406–407. Having resolved the threshold inquiry of foreseeability, we then proceeded to evaluate the various policy considerations relevant to the determination of the extent of the defendant's duty. Specifically, we considered: "(1) the normal expectations of participants in the sport in which the plaintiff and the defendant were engaged; (2) the public policy of encouraging continued vigorous participation in recreational sporting activities while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." Id., 407.

In applying these factors to the game of soccer, we concluded: (1) the normal expectations of participants in contact team sports such as soccer include a degree of physical contact and concomitant injury, indeed anticipated violations involving contact are expressly provided for in the rules of the game; id., 407–408; (2) the balance between promoting participation in contact team sports and protecting the safety of participants was best struck by the establishment of a standard of

reckless or intentional misconduct; id., 408–409; (3) such a balance would serve to minimize the litigation which would inevitably result if every negligent act could result in a civil action; id., 409–10; and (4) such a heightened standard of care is in accord with the law of other jurisdictions with regard to contact team sports. Id., 410–12.

Applying these same factors to the sport of skiing, we are not persuaded that the duty of care owed to fellow skiers should preclude liability for negligent behavior. As a threshold matter, we recognize, similar to our decision in *Jaworski*, that the specific harm alleged by the plaintiff was foreseeable and could have been anticipated as a likely result of the defendants' conduct. Although having passed the initial determination of foreseeability, for the various policy reasons as articulated in *Jaworski*, we conclude that the appropriate level of care demanded of coparticipants in the sport of skiing is that of reasonableness.

With regard to the first *Jaworski* factor, we recognize that skiing is a dangerous sport and that many injuries sustained during participation in the sport are caused by collisions with other skiers.[22] While collisions with other skiers are fairly common, frequency of occurrence is not the ultimate touchstone in evaluating the expectations of participants in the sport. Rather, we perceive the expectations of skiers to be that fellow participants in the sport will conduct themselves in a manner befitting the dangerous potentialities attendant with the sport. Thus, skiers will expect that other skiers will follow the rules and generally accepted practices

---

[22] "Indeed, other skiers are as much a part of the risk in downhill skiing, if not more so, than the snow and ice, elevation, contour, speed and weather conditions. As anyone who has ever undertaken the sport of skiing is painfully aware, it is a sport in which it is common for the participants to lose control." *Hughes* v. *Seven Springs Farm, Inc.*, 563 Pa. 501, 511, 762 A.2d 339 (2000).

of the sport of skiing. Indeed, our statutory scheme regarding ski liability confirms that skiers should possess such expectations as they take part in the sport. See General Statutes § 29-214 (detailing special defenses for ski area operator based upon failure of skier to engage in appropriate behavior while skiing).[23] Although § 29-214 deals with special defenses available to a ski area operator in an action brought by a skier, its pronouncements regarding appropriate and reasonable behavior while engaging in the sport are relevant to our inquiry with regard to the expectations of skiers. The normal expectations of skiers will be that fellow skiers will ski in a reasonable and appropriate manner.

Skiing also differs vastly in terms of the expectations of its participants from the more traditional contact sports of soccer, football, basketball and hockey. If skiers act in accordance with the rules and general practices of the sport, at reasonable speeds, and with a proper lookout for others on the slopes, the vast majority of contact between participants will be eliminated. The same may not be said of soccer, football, basketball and hockey; in those activities contact is an inherent part of the game that cannot be eliminated totally.

As for the second *Jaworski* factor, we conclude that the balancing of the public policy of the encouragement of vigorous participation in the sport of skiing and the protection of the safety of its participants weighs in

---

[23] General Statutes § 29-214 provides: "It shall be a special defense to any civil action against an operator by a skier that such skier: (1) Did not know the range of his own ability to negotiate any trail or slope marked in accordance with subdivision (3) of section 29-211; (2) did not ski within the limits of his own ability; (3) did not maintain reasonable control of speed and course at all times while skiing; (4) did not heed all posted warnings; (5) did not ski on a skiing area designated by the operator; or (6) did not embark on or disembark from a passenger tramway at a designated area. In such civil actions the law of comparative negligence shall apply."

favor of a negligence standard. We believe that requiring skiers to participate in the reasonable manner prescribed by the rules of the sport actually will promote participation in the sport of skiing. Should the threshold for liability be placed at a level that only reckless or intentional misconduct can serve as grounds for liability, many of the potential harms caused by coparticipants in the sport will go unremedied and, therefore, dissuade potential participants from taking part in the sport. Additionally, a standard of reasonableness also operates to protect the safety of participants in the sport of skiing.

The third *Jaworski* factor requires that we consider the goal of avoiding increased litigation in deciding upon the appropriate standard of care. Although undeniably an important factor in the evaluation as to the appropriate standard of care for a certain sport, this factor is not dispositive. If minimal litigation flowing from a sport is the ultimate goal, the standard always will be that of the heightened threshold of intentional or reckless conduct. Rather, this third factor focuses upon the diminishment of an *inappropriate* flood of litigation. For instance, in *Jaworski* we recognized quite correctly that the imposition of a negligence standard in contact sports would result undesirably in the potentiality of a civil action arising out of any foul, any hit batsman, or any clipping penalty. The same potential for undesirable numbers of civil actions is not present in the context of skiing. As discussed previously, abiding by the rules of the sport of skiing will eliminate the overwhelming majority of contact between skiers.

Finally, with regard to the fourth *Jaworski* factor, the persuasive guidance afforded by our sibling jurisdictions, we are persuaded that the better rule with regard to the standard of care implicated within the context of skiing is that of reasonableness. In *Jaworski* itself, our decision relied heavily upon *Nabozny* v. *Barnhill*,

31 Ill. App. 3d 212, 215, 334 N.E.2d 258 (1975), in which the Illinois Appellate Court recognized the tension between placing unreasonable burdens upon participation in a sport and the need to impose some of the restraints of civilization upon such participation. The court in *Nabozny* concluded that the standard of deliberate, wilful or reckless conduct triggering liability in tort was appropriate for the contact sport of soccer. Id. Since the *Nabozny* decision, we note that the same court also has been confronted with the proper standard of care implicated in the sport of skiing. In *Novak* v. *Virene*, 224 Ill. App. 3d 317, 321, 586 N.E.2d 578 (1991), the court stated: "*Nabozny* applied an exception to ordinary negligence liability for team sports in which contact was virtually inevitable. As in the individual sports of running and bicycling, there is the possibility of collisions in downhill skiing. But by one's participation in the sport, one does not voluntarily submit to bodily contact with other skiers, and such contact is not inevitable. . . . There is no reason to expand the limited contact sports exception to exempt downhill skiers from . . . liability if they negligently collide with other skiers." We agree that contact between skiers is neither a part of the sport that skiers agree to confront by their participation, nor is it an inevitable byproduct of the sport of skiing.

Application of the *Jaworski* factors to the sport of skiing leads us to conclude that the proper standard of care owed by coparticipants in the sport of skiing is that of reasonable care. Accordingly, the plaintiff's claim of negligence is sustainable under Connecticut law.

Both certified questions are answered: No.

No costs shall be taxed in this court to either party.

In this opinion SULLIVAN, C. J., and KATZ, VERTEFEUILLE and ZARELLA, Js., concurred.

BORDEN, J., with whom PALMER, J., joins, dissenting and concurring. I agree fully with part II of the majority opinion, namely, that our decision in *Jaworski* v. *Kiernan*, 241 Conn. 399, 696 A.2d 332 (1997), does not apply to collisions between a skier and a ski instructor caused by the instructor's negligence. I therefore concur in and join part II of the majority opinion.

I disagree, however, with part I of the majority opinion, in which the majority concludes that General Statutes § 29-212 does not bar the plaintiff skier's action seeking to recover for damages caused by a collision with a negligent ski instructor employed by the defendant ski area operator. I therefore dissent from part I of the majority opinion and, contrary to the majority, would answer "Yes" to the first certified question, namely, "[p]ursuant to . . . § 29-212,[1] does a skier

---

[1] Although both the certified question and the majority opinion specifically address only § 29-212, in my view, as I explain in more detail in part II of this opinion, § 29-212 is more properly analyzed in conjunction with General Statutes § 29-211. I, therefore, set out both of those statutes here.

General Statutes § 29-211 provides: "In the operation of a passenger tramway or ski area, each operator shall have the obligation to perform certain duties including, but not limited to: (1) Conspicuously marking all trail maintenance vehicles and furnishing the vehicles with flashing or rotating lights which shall be operated whenever the vehicles are working or moving within the skiing area; (2) conspicuously marking the location of any hydrant or similar device used in snow-making operations and placed on a trail or slope; (3) conspicuously marking the entrance to each trail or slope with a symbol, adopted or approved by the National Ski Areas Association, which identifies the relative degree of difficulty of such trail or slope or warns that such trail or slope is closed; (4) conspicuously marking all lift towers within the confines of any trail or slope; (5) maintaining one or more trail boards at prominent locations within the ski area displaying such area's network of ski trails and slopes, designating each trail or slope in the same manner as in subdivision (3) and notifying each skier that the wearing of ski retention straps or other devices used to prevent runaway skis is required by this section, section 29-201 and sections 29-212 to 29-214, inclusive; (6) in the event maintenance men or equipment are being employed on any trail or slope during the hours at which such trail or slope is open to the public, conspicuously posting notice thereof at the entrance to such trail or slope; and (7) conspicuously marking trail or slope intersections."

General Statutes § 29-212 provides: "Each skier shall assume the risk of and legal responsibility for any injury to his person or property arising out of

assume the risk of, and legal responsibility for, an injury arising out of a collision with a ski instructor, acting in the course of his employment with the ski area operator, when the collision is caused by the instructor's negligence?" In the remainder of this opinion, therefore, I address only the first certified question.

I begin by stating what I agree with regarding part I of the majority opinion. First, I agree with the majority that the claim of the plaintiff, Mary Ann Jagger, against the defendant ski operator, Mohawk Mountain Ski Area, Inc. (Mohawk), is based on vicarious liability, namely, that the defendant ski instructor, James Courtot, while in the scope of his employment, negligently lost control and collided with the plaintiff, and that Mohawk is vicariously liable as Courtot's employer, and on direct liability, namely, that Mohawk negligently failed to train and supervise Courtot.

Second, I agree with the majority's suggestion that § 29-212 presents an example of what might be viewed as legal schizophrenia, using that psychiatric word in its more popular sense of a split personality. On the one hand, § 29-212 provides that a skier "assume[s] the risk[s] of and legal responsibility for any injury to his person or property arising out of the hazards inherent

---

the hazards inherent in the sport of skiing, unless the injury was proximately caused by the negligent operation of the ski area by the ski area operator, his agents or employees. Such hazards include, but are not limited to: (1) Variations in the terrain of the trail or slope which is marked in accordance with subdivision (3) of section 29-211 or variations in surface or subsurface snow or ice conditions, except that no skier assumes the risk of variations which are caused by the operator unless such variations are caused by snow making, snow grooming or rescue operations; (2) bare spots which do not require the closing of the trail or slope; (3) conspicuously marked lift towers; (4) trees or other objects not within the confines of the trail or slope; (5) boarding a passenger tramway without prior knowledge of proper loading and unloading procedures or without reading instructions concerning loading and unloading posted at the base of such passenger tramway or without asking for such instructions; and (6) collisions with any other person by any skier while skiing."

in the sport of skiing"—which means that a skier *may not* recover for injuries caused by the negligent conduct of the ski area operator or its employees because of the doctrine of assumption of risk, under whatever form of the doctrine is adopted. This is because the doctrine by definition provides a complete defense to a claim of negligence. On the other hand, § 29-212 provides that a skier may, nonetheless, recover if "the injury was proximately caused by the negligent operation of the ski area by the ski area operator, his agents or employees"—which means that a skier *may* recover for injuries caused by the negligent conduct of the ski area operator or its employees, despite the doctrine of assumption of risk. Read literally, therefore, § 29-212 simply does not make sense because the two propositions are, without more, simply contradictory to each other.

Third, I agree with the majority that § 29-212, including its counterparts in § 29-211; see footnote 1 of this opinion; and General Statutes §§ 29-213 and 29-214,[2]

---

[2] General Statutes § 29-213 provides: "No skier shall: (1) Intentionally drop, throw or expel any object from a passenger tramway; (2) do any act which shall interfere with the running or operation of a passenger tramway; (3) use a passenger tramway without the permission of the operator; (4) place any object in the skiing area or on the uphill track of a passenger tramway which may cause a skier to fall; (5) cross the track of a J bar lift, T bar lift, platter pull or similar device or a rope tow, except at a designated location; (6) depart from the scene of a skiing accident when involved in the accident without leaving personal identification, including name and address, or before notifying the proper authorities and obtaining assistance when such skier knows that any other skier involved in the accident is in need of medical or other assistance; (7) fail to wear retention straps or other devices used to prevent runaway skis."

General Statutes § 29-214 provides: "It shall be a special defense to any civil action against an operator by a skier that such skier: (1) Did not know the range of his own ability to negotiate any trail or slope marked in accordance with subdivision (3) of section 29-211; (2) did not ski within the limits of his own ability; (3) did not maintain reasonable control of speed and course at all times while skiing; (4) did not heed all posted warnings; (5) did not ski on a skiing area designated by the operator; or (6) did not embark on or disembark from a passenger tramway at a designated area. In such civil actions the law of comparative negligence shall apply."

were adopted in the wake of the Vermont Supreme Court's decision in *Sunday* v. *Stratton Corp.*, 136 Vt. 293, 390 A.2d 398 (1978), in which that court held that the doctrine of assumption of risk did not bar the plaintiff skier's action against the ski area operator for his injuries arising out of a fall caused by a clump of brush located a short distance off the edge of the trail. I also agree that the legislative history of those statutes indicates *both*: (1) a purpose to protect the Connecticut ski area industry from what the industry perceived to be a severe risk of financial ruin, by erecting a shield from liability for the industry consisting of the explicit recognition of the doctrine of assumption of risk; and (2) a purpose to see that skiers injured by the ski area operator's negligence would nonetheless retain the right to recover. My reading of the entire legislative history, however; see 22 S. Proc., Pt. 4, 1979 Sess., p. 1150; 22 S. Proc., Pt. 7, 1979 Sess., p. 2380; 22 S. Proc., Pt. 11, 1979 Sess., p. 3654; 22 S. Proc., Pt. 15, 1979 Sess., pp. 4874–86, 5135; 22 H.R. Proc., Pt. 10, 1979 Sess., p. 3278; 22 H.R. Proc., Pt. 36, 1979 Sess., pp. 12,663–12,707; Conn. Joint Standing Committee Hearings, Public Safety, Pt. 2, 1979 Sess., pp. 436–50, 452–64; convinces me that the legislature never explicitly came to grips with the notion that these two purposes were and are in direct conflict with each other. Hence, the superficial, at least, schizophrenia, which I noted previously. Put another way, in order to resolve this inherent conflict within the statutory scheme, we must find "something more" in it to have it make sense.

Therefore, as is usually the case regarding difficult questions of statutory interpretation, it is left to the judiciary to interpret the statutory scheme so as to make sense of it. Consequently, I agree with the majority's

All four statutory sections, namely, §§ 29-211, 29-212, 29-213 and 29-214, were adopted as §§ 2 through 5 of No. 79-629 of the 1979 Public Acts. Thus, they should be viewed together.

implicit recognition that there must be something more to make sense of the statute and, therefore, it is necessary to identify some overarching principle that will do so.

The majority finds that overarching principle in the notion of control. The majority states that "pursuant to § 29-212, a skier has assumed the risk of hazards inherent in the sport of skiing; namely, those hazards that are beyond the control of the ski area operator and cannot be minimized by the operator's exercise of reasonable care. For those risks that are within the sphere of control of the ski area operator, and that may be minimized or eliminated with reasonable practicality, the operator owes a duty of due care and may be held liable in tort should that duty be breached and proximately cause injury to a skier." This means, according to the majority, that: (1) if the hazard is one over which the ski operator has control—that is, a hazard that the ski operator "may . . . [minimize] or [eliminate] with reasonable practicality"—the operator is liable, and the skier has *not* assumed the risk; but (2) if the risk is one over which the ski operator does *not* have control—that is, a hazard that the ski operator may *not* minimize or eliminate with reasonable practicality—the skier *has* assumed the risk, and the operator is *not* liable.

Applying that principle to the claim of the plaintiff, the majority then concludes "that the negligence of an employee or agent of a ski area operator is not an inherent hazard of the sport of skiing," and that, therefore, the plaintiff's claim "is not statutorily barred by § 29-212 . . . ." Necessarily implicit in this conclusion of liability on the part of the ski operator is the conclusion that the operator had control over its employee's negligent skiing—that is, that the employee's negligent skiing was a hazard that the operator could have minimized or eliminated with reasonable practicality.

## I

Before proceeding with my competing analysis of the statutory scheme, I note that, in my view, the majority's conclusion is fundamentally flawed even on its own terms. The vicarious liability claim here is that Mohawk is vicariously liable because Courtot, who was out on the slopes in the scope of his employment, negligently lost control and collided with the plaintiff. I simply fail to see how such conduct reasonably can be considered within the control of Mohawk.

Any and every ski instructor, no matter how carefully selected, trained, and instructed to be careful, and no matter what degree of control is attempted to be exercised by the ski area operator, can at any instantaneous moment of skiing lose control, and that is a risk that is simply "beyond the control of the ski area operator and cannot be minimized by the operator's exercise of reasonable care." Thus, under the majority's test, I would think that the conclusion would have to be that the plaintiff's claim would be barred by § 29-212 because, under that test, the skier *has* assumed a risk inherent in the sport of skiing, namely, a risk that is not within the control of the ski area operator. Indeed, that is just the point of vicarious liability of an employer: the employer is liable, not because he is at fault in any way—in fact, he is liable despite the fact that he is *not* at fault—but only because he, as the profit taker, should bear the loss as between him and the *other innocent* party, who was injured by his employee's negligence. See *Nowak* v. *Nowak*, 175 Conn. 112, 125–26, 394 A.2d 716 (1978). Put another way, if the ski area operator *were* in control of the ski instructor at that time, the operator would be directly liable, not vicariously liable.[3]

---

[3] Of course, to the extent that the plaintiff claims that the employer failed in conduct over which it did have control, such as selecting, training or instructing its ski instructors, then the majority's test of control would mean that, under *that* allegation, as well as the allegation of the operator's vicarious liability for the ski instructor's loss of control on the slopes, the ski operator

In addition, the majority opinion has ignored critical language of § 29-212 that bears directly on the present case. Among the risks that § 29-212 specifically assigns to the assumption of risk category undertaken by the skier—and therefore the category of *nonliability* of the ski operator—is subdivision (6), which concerns "collisions with any other person by any skier while skiing."[4] That language applies directly to the facts of this case. Moreover, that language must apply to this case, where the "other person" is employed by the ski area, because if the other skier were not an agent or employee of the ski area, the ski area operator would have no legal responsibility for his negligence in the first place and, hence, no need to be shielded from liability by the doctrine of assumption of risk.

Finally, as the majority has articulated and applied its test in the present case, in my view it has in effect written the doctrine of assumption of risk out of the statute entirely. The majority states: "[W]e conclude that the negligence of an employee or agent of a ski area operator is not an inherent hazard of the sport

would also be liable and the plaintiff would not have assumed the risk. The majority opinion, however, contains no such limitation. Therefore, under the majority's analysis, the ski operator would be liable under *both* sets of allegations; the direct liability allegation would be an a fortiori case as compared to the vicarious liability allegations. Thus, as I explain further in the text of this opinion, under the majority's analysis, there are virtually no allegations that would invoke the doctrine of assumption of risk to bar a skier's claims against the ski operator.

[4] The majority concludes that this specific language does not control this case because the statute "creates an exception for injuries arising out of the negligent operation of the ski area by the operator," which the majority further defines by its "fictitious control" analysis. That must also mean, therefore, that if *any* of the specifically identified risks in subdivisions (1) through (5) of § 29-212; see footnote 1 of this dissent; are realized, the ski operator will not be shielded by the doctrine of assumption of risk with respect to any of those other risks, because they are all obviously within the operator's control. Thus, as I point out in this dissent, the majority effectively reads the doctrine of assumption of risk out of the statutory scheme, despite the specific provisions of § 29-212 (1) through (6).

of skiing," and, therefore, will not be barred by the assumption of risk part of the statutory scheme. The problem is this: *every* claim by an injured plaintiff will necessarily arise out of the alleged negligence of an employee or agent of the ski area. I cannot readily think of one that will not—unless, of course, it is the rare case in which the ski area happens to be owned by one person and the injury happens to have been caused by the negligence of the owner, rather than one of the employees. This is particularly true where, as will usually be the case, the ski area operator is a corporate entity; in such a case, the corporation can only be liable through the negligence of its agents. Therefore, all that a plaintiff's lawyer will have to do in order to avoid any application of the assumption of risk part of the statute will be to allege vicarious liability of the employer based upon "the negligence of an employee or agent" of the operator, and make allegations tying the alleged negligent conduct to that employee or group of employees who had the responsibility for that particular aspect of the negligent conduct. Thus, under the majority's formulation of the test, and particularly under its application of the test to the facts of the present case, I fail to see what risks will fall under the assumption of risk doctrine and, therefore, be barred by § 29-212. The majority, therefore, has taken a statute that was conceived, originally at least, as an *aid* to the ski industry by ensuring that the doctrine of assumption of risk would apply, at least as to *some* claims against the ski operator, and interprets it in such a way that the doctrine will practically *never* apply. In other words, using the majority's test, as it is applied in the present case, I am hard put to conceive of a factual situation in which an operator, who would otherwise be liable, would nonetheless be shielded by the assumption of risk doctrine.[5]

---

[5] Ironically, the majority's discussion of the policy roots of vicarious liability; see footnote 16 of the majority opinion; further bolsters this point. By casting its test of control in terms of the *right* to control, which is one of

## II

Having stated my disagreement with the majority's analysis, I now return to what I view as the appropriate way to make sense of the competing principles of § 29-212 concerning (1) the imposition of the doctrine of assumption of risk by a skier, and therefore no liability for the ski area operator for damages to an injured skier, and (2) liability in the ski area operator to the injured skier based on the negligence of the employees or agents of the ski area operator. Unlike the majority, however, I resolve this statutory dilemma by reading the statutory scheme as a whole, and by consulting the language of the statute. Moreover, unlike the majority's analysis, my analysis leaves room for *both* liability based on negligence *and* assumption of the risk, depending on the facts alleged, and the applicable language of the entire statutory scheme.

I begin with § 29-211. See footnote 1 of this opinion for the text of § 29-211. Section 29-211 begins as follows: "In the *operation* of a passenger tramway or ski area, each *operator* shall have the obligation to perform certain duties *including, but not limited to*" seven specified duties. (Emphasis added.) That statute then lists those seven nonexclusive obligations or duties, which focus on such matters as conspicuously marking trails

the bases for vicarious liability, the majority ensures that the ski operator will *never* be shielded by the doctrine of assumption of risk. This is true because: (1) an operator would never be liable in the first instance for conduct or omissions of his employees unless he had the *right* to control their conduct in question—what the majority accurately refers to as "fictitious control"; see footnote 16 of the majority opinion; and (2) *therefore* under the majority's analysis, if the conduct in question *was* within that sphere of fictitious control, the operator would be liable. From what risks, then, will the operator be shielded by the doctrine of assumption of risk? I cannot think of any. Moreover, this is true irrespective of whether the skier's claim is based on direct or vicarious liability, because under the majority's "control" analysis, the ski operator would always be deemed to have control over his *own* conduct.

and hazards, maintaining trail boards indicating the relative difficulties of trails, notifying skiers of the need for ski retention devices, conspicuously giving notice when maintenance men or equipment will be on the trails, and conspicuously marking trail intersections. What is notable about § 29-211, which specifies a set of explicit but explicitly nonexclusive obligations of the ski area operator,[6] is that it ties these obligations directly to the "*operation* of a . . . ski area . . . ." (Emphasis added.) Thus, I view these obligations as a set of legislative directives as to what kinds of obligations are inherent in the operation of a ski area.

This is significant because § 29-212, after stating that a skier assumes the risks inherent in the sport of skiing, states the following proviso: "unless the injury was proximately caused by the negligent *operation* of the ski area by the ski area operator, his agents or employees." (Emphasis added.) The use of the word "operation" here creates a direct linguistic link to the use of the same word in § 29-211. This linguistic link suggests to me that the scope of the ski area operator's liability, as opposed to the skier's assumption of risk, must be measured by reference to the obligations listed in § 29-211 as those obligations or duties that are part and parcel of the *operation* of a ski area. Put another way, my view of making sense of the statute is as follows: if the claim of negligence involves conduct within those matters listed in § 29-211, or some other conduct that,

---

[6] In this regard, I disagree with the thrust of the argument contained in part I A of the majority opinion, which lays heavy emphasis on a perceived difference between the statutory "obligations" of the ski area operator and the statutory "duties" of the ski area operator, as phrased in § 29-211. I simply fail to see the significance of this semantic difference. The statute provides that the operator has the obligation to perform these duties. It would mean the same, I think, if it provided, instead, that the operator had "certain duties, including but not limited to" the same seven nonexclusive duties.

by its nature, is inherent in the operation of a ski area,[7] the ski area operator would be liable for the negligence. If the claim of negligence does not fall within that defined sphere, the skier is deemed to have assumed the risk under § 29-212.

Obviously, every case would have to be evaluated on a fact specific basis under this standard, and by reference to the language used in both §§ 29-211 and 29-212. It is clear to me, however, that an instantaneous loss of control by a ski instructor on the slopes does not fall within the type of conduct that is covered by § 29-211.

Furthermore, I refer to the language of § 29-212 (6), which specifically provides that one of the risks that a skier assumes is "collisions with any other person by any skier while skiing." This language does not suggest, nor does any reason in policy suggest, that the phrase, "collisions with any other person," has an implicit exception for a collision with an "other person" who is employed by the ski area operator. Such a collision is precisely what happened in the present case. I conclude, therefore, that Mohawk is not liable for the collision alleged by the plaintiff in this case because: (1) an instantaneous loss of control by Courtot is not a matter that falls within the type of conduct specified in § 29-211 as inherent in the operation of a ski area; and (2) such a collision is specifically identified in § 29-212 (6) as the type of mishap as to which the plaintiff was deemed to have assumed the risk.[8]

I would, therefore, answer the first certified question in the positive.

---

[7] For example, I would conclude that the failure to train ski instructors would be within the negligent operation of a ski area, within the meaning of the liability portion of § 29-212. See footnote 7 of the majority opinion.

[8] I reiterate, however, that, to the extent that the plaintiff claims that the collision was proximately caused, not by any instantaneous loss of control by Courtot, but by Mohawk's failure to properly train or supervise him, the plaintiff would be entitled to recover. See footnote 7 of this opinion.