**Lori T. CHEPKEVICH and Jeff Chepkevich, Appellants**

v.

**HIDDEN VALLEY RESORT, L.P., Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 19, 2006.
Filed Nov. 13, 2006.

Templeton Smith, Jr., Pittsburgh, for appellants.

Jamie Lenzi, Pittsburgh, for appellee.

BEFORE: STEVENS, TODD, and McCAFFERY, JJ.

OPINION BY STEVENS, J.:

¶ 1 Appellants, Lori T. Chepkevich (Lori) and Jeff Chepkevich (Jeff) (collectively Appellants), appeal from the Order entered in the Court of Common Pleas of Somerset County on December 12, 2005, at which time the trial court granted the Motion for Summary Judgment of Appellee, Hidden Valley Resort, L.P. After careful review, we reverse.

¶ 2 The salient facts and procedural history in the instant matter are as follows: On April 4, 2003, Appellants filed a Complaint in which they averred that on December 31, 2001, Lori, along with her six-year-old nephew, Nicholas, was a business invitee on the snow skiing premises of Appellee. Lori and Nicholas intended to board a chairlift, but Lori was concerned Nicholas would have a difficult time safely doing so due to his small size and skiing inexperience. Lori asked the chair lift operator to slow the device so that she and Nicholas could board safely. The operator agreed to stop the chair lift, but he did so on the side of the pulley opposite from where Lori and Nicholas were standing. The chair lift operator assured Lori he would bring the chair around to Nicholas and her and stop it for boarding. See Complaint at 1.

¶ 3 The operator failed to slow or stop the chair lift when it arrived, and though he attempted to place Nicholas on the seat, the operator managed only to get him on its edge, after which Nicholas began to slip. Lori made an effort to pull Nicholas to safety and shouted to the operator to stop the lift, as the boy was falling. The operator failed to do so, and the lift continued moving for some distance until Lori and Nicholas were forced to fall to the ground. Appellants alleged the resulting injuries to Lori, and Jeff's loss of consortium claim, stemmed from Appellee's negligence through the actions of its employee, the chair lift operator. See Complaint at 2.

¶ 4 On May 27, 2003, Appellee filed its Answer and New Matter. In that pleading, Appellee averred, *inter alia*, that as one of its season pass holders, Lori executed a Release from Liability form in which she agreed that:

all the risks of skiing and boarding present the risk of serious or fatal injury. By accepting this Season Pass, I agree to accept all these risks and agree not to sue Hidden Valley Resort or their employees if injured while using their facilities regardless of any negligence on their part.

Answer and New Matter, Paragraph 27.

¶ 5 On November 19, 2003, Appellants filed a Motion to Amend Complaint and Appellee filed a Consent to File Amended Complaint on December 1, 2003.

¶ 6 On December 3, 2003, Appellants filed an Amended Complaint in which they set forth essentially the same facts.[1]

¶ 7 On February 10, 2005, Appellee filed a Motion for Summary Judgment in which it averred that the language of the lift agreement acted as a complete release, and that as an intermediate skier, Lori assumed the risk of injury during downhill skiing.

¶ 8 On August 10, 2004, Lori's deposition testimony was taken, at which time she testified that she learned on the day of the accident that the lift she was boarding with her nephew, the Blizzard Lift, had only one speed. N.T., 8/10/04, at 14. Lori explained that she and Nicholas were boarding that lift because it was the way to return to their condominium and Nicholas, a beginner skier, was cold. Lori offered to take Nicholas back to the condominium while other family members remained skiing. N.T., 8/10/04, at 17.

¶ 9 Lori had requested that the lift be slowed down so that Nicholas might board safely, as she was not sure about his familiarity with boarding moving lifts. N.T., 8/10/04, at 15, 19. Lori was told by the lift operator that "the lift doesn't slow down. It is either stopped or it's moving." N.T., 8/10/04, at 20. Lori further explained, "[h]e said that he would stop the lift, let us get out on the line and then he would bring it around to us and stop it so we could get on; that he would help Nicholas on." N.T., 8/10/04, at 20. Lori understood that the lift operator would stop the lift a second time, as opposed to stopping it just one time. N.T., 8/10/04, at 20.

¶ 10 The lift operator stopped the chair lift and positioned it behind the bull wheel.

N.T., 8/10/04, at 21. Lori and Nicholas proceeded to position themselves on the line in the proper loading position and the lift was started. N.T., 8/10/04, at 21–23. Lori explained what transpired next as follows:

> The operator told me he was going to start the lift. The lift came around and, you know, hit us in the behind, and I sat and the operator reached around and grabbed Nicholas' shoulder and tried to hoist him up on to the chairlift all in that one swoop as it was moving.
>
> As we started up, it only caught him on the very edge of his rear end. His little feet were dangling and he was sliding. I tried to grab him with my other hand [2] to push him back.
>
> As I realized that he wasn't going to make it, we both fell. Of course, I screamed, 'Stop. Stop. He's not on the lift.'

N.T., 8/10/04, at 25–26. Lori testified the lift was still moving as she and Nicholas fell out. N.T., 8/10/04, at 27.

¶ 11 Lori did not recall reading the Release from Liability form prior to signing it, though she admitted to understanding the language contained within the document when she read it at her deposition. She explained that had she read and understood the Release from Liability prior to that time she "probably would have understood; not agreed, but still signed." N.T., 8/10/04, at 29–32. Lori had requested that lifts be stopped on prior occasions. N.T., 8/10/04, at 32–33. Lori explained she felt the lift operator acted wrongfully in failing to stop the lift a second time as he had promised so she and Nicholas could board the lift safely and when he "yanked"

---

1. Appellants' only change was in paragraph two (2) in which they indicated Appellee is Hidden Valley Resort, L.P.

2. Lori indicated earlier in her testimony she had been holding both her ski poles and Nicholas' in her right hand, and Nicholas was positioned to her left. N.T., 2/28/05, at 25.

Nicholas to place him on the lift. N.T., 8/10/04, at 33–34.

¶ 12 On November 28, 2005, oral argument was held regarding Appellee's Motion for Summary Judgment. At that time, Appellee contended the matter should be dismissed for three reasons. Argument, 11/28/05, at 4. Specifically, Appellee argued the "no duty rule" prevents Appellants' negligence cause of action, that Lori assumed the risk of injury, and that the release Appellants signed bars any recovery. Argument, 11/28/05, at 4–7. Appellee cited our Supreme Court's decision in *Hughes v. Seven Springs,* 563 Pa. 501, 762 A.2d 339 (2000) throughout argument.[3]

¶ 13 In response, Appellants contended Lori's injury was not an inherent risk envisioned in the exculpatory release, and in fact, a second agreement had been made with and breached by Appellee through its agent, the lift operator, who promised to stop the lift prior to Lori and Nicholas' boarding. Argument, 11/28/05, at 12.

¶ 14 In its Memorandum filed on December 13, 2005, and issued in compliance with Pa.R.A.P. 1925(a) on December 28, 2005,[4] after an analysis of the assumption of the risk doctrine and the Skiers Responsibility Act,[5] the trial court determined that Lori was engaged in the act of downhill skiing at the time of her injury, but "[b]ecause the negligent operation of a ski lift is not a risk inherent in the sport of downhill skiing, ... a question of fact exists as to whether the operator's acts were negligent, and the proximate cause of [Lori's] injuries;" thus, the trial court found Appellee was not entitled to summary judgment as a matter of law on that issue. Trial Court Memorandum at 5, 7. Nevertheless, after a consideration of the Release from Liability document which Lori executed prior to her injury and which provided Lori agreed to accept all risks of skiing and boarding and not to sue "regardless of any negligence on [Appellee's] part," the trial court determined "[Appellants] may not bring suit on the basis of negligence against [Appellee] for injuries suffered while engaged in the activity detailed in the release, which specifically includes riding the chair lift." Trial Court Memorandum at 8, 13.

¶ 15 In their brief, Appellants raise the following three (3) issues for our review:

1. Whether a release exonerating a ski area from liability for injuries caused by the inherent risks of downhill skiing, regardless of negligence on the part of the ski area, precludes the signer thereof from suing the ski area for the negligent action of its lift operator in (a) failing to stop a chair lift to enable a six-year-old child to board after expressly agreeing to do so and (b) lifting the six-year-old child and placing him partially on a moving chair.

2. Whether a release exonerating a ski area from liability for injuries caused by the inherent customary risks of downhill skiing regardless of negligence on the part of the ski area, precludes the signer thereof from suing the ski area for a ski area employee's negligence that cre-

---

**3.** We will discuss this case in more detail *infra.*

**4.** The trial court did not require, nor did Appellants file a Pa.R.A.P. 1925(b) statement; nevertheless, as shall be discussed, *infra,* the issues Appellants raise in their brief were argued before the trial court on November 28, 2005.

**5.** 42 Pa.C.S.A. § 7102(c).

ates a risk that is not an inherent risk of the sport of downhill skiing.

3. Whether [Lori's] agreement to the ski area's release from liability was superseded by the express agreement of the ski area's lift operator to stop the chair to enable [Lori's] six-year-old nephew to board the lift.

¶ 16 A trial court's basis for granting a summary judgment motion and this Court's standard of review in summary judgment matters are as follows:

Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroversial allegations in the pleadings, depositions, answers to interrogatories, admissions of record and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

As already noted, on appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of

summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Weber v. Lancaster Newspapers, Inc.,* 878 A.2d 63, 71 (Pa.Super.2005), *citing Gutteridge v. A.P. Green Servs.,* 804 A.2d 643, 651 (Pa.Super.2002) (citations omitted), *appeal denied,* 574 Pa. 748, 829 A.2d 1158 (2003).

¶ 17 Both the trial court and Appellee cite to *Hughes v. Seven Springs,* 563 Pa. 501, 762 A.2d 339 (2000) in their respective memoranda. Appellee contends that *Hughes* is dispositive herein; however, unlike in the case under discussion, *Hughes* did not involve a claim of negligent operation of a lift operator. Rather, in that case, an injured skier was struck from behind by another while she was propelling herself towards the ski lift after completing a downhill run. *Id.* at 510, 762 A.2d at 344. Our Supreme Court determined that the Skier's Responsibility Act preserved the assumption of the risk doctrine and concluded that as a matter of law the facts viewed in a light most favorable to the appellee illustrated she had been engaged in the sport of downhill skiing at the time of the collision and that the risk of colliding with another skier at the base of a ski slope is a common, frequent and expected risk inherent in downhill skiing pursuant to 42 Pa.C.S. § 7102(c)(1). *Id.* Significantly, the appellee had also indicated in her deposition testimony that prior to the accident, she had read and was familiar with the Skier's Responsibility Code which was also posted at her resort. *Id.* at 512, 762 A.2d at 345.

¶ 18 We find this Court's recent decision in *Beck–Hummel v. Ski Shawnee, Inc.,* 902 A.2d 1266 (Pa.Super.2006) to be more ap-

plicable to the case at bar. In *Beck–Hummel*, we determined that because we could not conclude as a matter of law that an exculpatory release was enforceable, the trial court erred in granting summary judgment. We noted that, generally, releases are not favored in the law and that to be enforceable, a release must meet the following standards:

> (1) it must not contravene any policy of the law; (2) it must be a contract between individuals relating to their private affairs; (3) each party must be a free bargaining agent, not simply one drawn into an adhesion contract, with no recourse but to reject the entire transaction; and (4) the agreement must spell out the intent of the parties with the utmost particularity.

*Id.* at 1269 (citations omitted). We also added that this Court shall construe such an agreement strictly and against the party who asserts it. *Id.* (citation omitted).

¶ 19 Though we found in *Beck–Hummel* that the ticket disclaimer explicitly specified that the user assumed the risk of participating in activities at the ski resort, we also were guided by Restatement (Second) of Torts § 496B entitled Express Assumption of Risk. We found particularly instructive comment d to Section 496B which generally states that a plaintiff must assent to its terms for an express agreement assuming the risk to be effective. We also stressed that particularly where the defendant drafts the agreement and the plaintiff is merely a recipient of the document, "it must appear that the terms were in fact brought home to him and understood by him, before it can be found he has accepted them." *Id.* at 1273–1274 (*citing* Rest.2d Torts § 496B, cmt. c).

■ ¶ 20 Factors which should be considered in determining whether a reasonable person should have noticed a warranty disclaimer include:

> (1) the disclaimer's placement in the document, (2) the size of the disclaimer's print, and (3) whether the disclaimer was highlighted by being printed in all capital letters *or in a type style or color* different from the remainder of the document.

*Id.* at 1274 (citation omitted).

■ ¶ 21 With the foregoing as a backdrop to the case *sub judice*, we note that herein, the Release from Liability form contains the following language which is printed in the same, relatively small font as the remaining text and is located in the final sentence of the first paragraph: "By accepting this Season Pass I agree to accept all these risks and agree not to sue [Appellee] or their employees if injured while using their facilities regardless of any negligence on their part." Also noteworthy is the opening line of the Release which provides: "Skiing, Snowboarding, and Snowblading, including the use of lifts, is a dangerous sport with inherent and other risks . . . ."

¶ 22 Significantly, the legal term "negligence" is not clearly defined or illustrated in any way, such as with an example of conduct that can be considered negligent.[6]

---

**6.** Jeff purchased the 2001–2002 Season Ski Passes for Lori, their two sons, and himself on September 28, 2001. N.T., 8/10/04, at 28; group Exhibit 1. Though the date is not clear on the document itself, Lori believed she signed the Release from Liability form either the day before or the day of her accident. N.T., 8/10/04, at 56. On that release, Lori's name appears on a signature line numbered 147, and she signed her minor son, Ryan's, name above hers on line 146. The form begins with a signature on line 129 and ends with a signature on line 167. In addition, Lori testified that though she had never skied at any resort other than Appellee, she did not read the exculpatory language on the Release from Liability form, nor did she indicate that she was ever verbally informed that she was

As such, Appellee's Release from Liability arguably amounts to an adhesion contract which provides no recourse to one who disagrees with it but to reject the entire transaction.

¶ 23 Furthermore, Appellants argue herein that even had they voluntarily entered into a contractual agreement with Appellee, a second one had been established when the lift operator agreed to stop the lift twice so that Nicholas could safely board it. Unlike the situation in *Hughes, supra,* where the accident was the result of a collision between two skiers, herein Appellants contend Lori's injuries were the result of the negligent conduct of the ski lift operator. Thus, under the circumstances of this case, even though Lori admittedly did not read the Release from Liability form, there is an assertion that an agreement was reached between Lori and the lift operator which superseded any that might have been created under the Release from Liability form; therefore, we cannot conclude as a matter of law that the disclaimer is enforceable, as this question of fact remains as to what the ski lift operator said to Appellant. *See Beck–Hummel,* at 1275. Accordingly, we find that the trial court erred in granting summary judgment to Appellee on this basis, reverse the trial court's Order, and remand for further proceedings.

¶ 24 Order entering summary judgment Reversed. Case Remanded. Jurisdiction Relinquished.

entering into a contractual agreement with Appellee prior to executing the same.