**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1769
_____

QUAN VU; MAY SIEW,
                                        Appellants

v.

SKI LIBERTY OPERATING CORP., doing business as LIBERTY MOUNTAIN
RESORT; SNOW TIME, INC.
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:16-cv-02170)
District Judge:  Hon. John E. Jones, III

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 22, 2019

Before:  CHAGARES and BIBAS, <u>Circuit</u> <u>Judges</u>, and SÁNCHEZ, <u>Chief</u> <u>District</u>
<u>Judge</u>[+].

(Filed: February 12, 2019)

_____

OPINION[*]
_____

_____

[+] The Honorable Juan Sánchez, Chief United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.
[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

CHAGARES, Circuit Judge.

Appellants Quan Vu and his spouse, May Siew (collectively, "the plaintiffs"), brought this action against the defendants, Ski Liberty Operating Corporation, d/b/a Liberty Mountain Resort and Snow Time, Inc., for damages relating to injuries Vu suffered while skiing at Liberty Mountain Resort. The defendants successfully moved for summary judgment, and the plaintiffs now appeal. Because we conclude that the plaintiffs' cause of action is barred by the Pennsylvania Skier's Responsibility Act, 42 Pa. Cons. Stat. § 7102(c) ("PSRA"), we will affirm.

I.

We write principally for the parties and therefore recite only those facts necessary to our decision. On the evening of January 23, 2015, Vu was skiing down a trail at the Liberty Mountain Resort in Pennsylvania. At some point, Vu encountered a snowboarder, who "either cut [him] off or got awfully close" to him. Appendix ("App.") 314. To avoid colliding with the snowboarder, Vu "had a knee-jerk reaction to veer," which led him toward the edge of the trail. Id. Vu skied over the edge, left the slope, and landed among a pile of rocks. He suffered multiple serious injuries, which he alleges were caused by his skiing over an unmarked, "artificial three to four-foot cliff at the slope's edge" that was created by "the Defendants' snowmaking and snow grooming practices." Vu Br. 4.

Vu's daughter, who was skiing with him, testified that she did not see Vu ski off of the slope, but she did find him laying off of the trail. She stated that to get to her father, she had to exercise caution due to the height difference between the artificial snow

2

and the natural terrain. She also testified that she had no "difficulty that evening discerning the edge of the trail." App. 74–75.

Dawson Disotelle was also present on the slope and witnessed the incident. He testified that he was snowboarding behind Vu and Vu's daughter, and he saw that Vu's "skis went to the left and his body went with [them] and he just went straight off the run." App. 124–25. Thereafter, Disotelle attempted to render assistance to Vu, which required Disotelle to "hop[] down" to where Vu was laying. App. 143. According to Disotelle, the elevation change from the slope to where Vu landed was "[t]hree or four feet maybe," and "it wasn't a challenge to get down there." Id. Like Vu's daughter, Disotelle testified that he was able to "easily" distinguish the skiable trail from off trail. App. 129.

The plaintiffs filed a two-count complaint in October 2016. The first count alleged that the defendants were negligent for, among other things, failing to keep the slope free from unsafe conditions, warn Vu of the dangerous condition, and erect a fence or boundary marker to prevent skiers "from skiing over the edge and into the large rocks below." App. 902–03. In the second count, Siew alleged loss of consortium.

The defendants moved for summary judgment, arguing in part that the plaintiffs' action was barred because "skiing off trail and colliding into rocks . . . is an inherent risk" of downhill skiing. App. 784. The District Court agreed and granted the motion. The plaintiffs now appeal.

## II.

The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the grant of

3

summary judgment, Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 268 (3d Cir. 2008), and must ascertain whether the movant has "show[n] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In conducting this analysis, we "view the facts in the light most favorable to the non-moving party." Bjorgung, 550 F.3d at 268.

III.

In this action based on diversity jurisdiction, we apply Pennsylvania law. See Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000). The statute upon which this case turns is the PSRA, which acknowledges that "there are inherent risks in the sport of downhill skiing," 42 Pa. Cons. Stat. § 7102(c)(1), and, for that reason, "preserves assumption of risk as a defense to negligence suits stemming from downhill skiing injuries," Smith v. Seven Springs Farm, Inc., 716 F.2d 1002, 1007 (3d Cir. 1983).

The PSRA establishes a "no-duty" rule for skiing injuries, relieving ski resorts of the "duty to protect skiers from risks that are 'common, frequent, and expected,' and thus 'inherent' to the sport." Chepkevich v. Hidden Valley Resort, L.P., 2 A.3d 1174, 1186 (Pa. 2010). The no-duty rule applies in this context when: (1) the plaintiff was "engaged in the sport of downhill skiing at the time of her injury"; and (2) the risk of the injury at issue "is one of the 'inherent risks' of downhill skiing." Hughes v. Seven Springs Farm, Inc., 762 A.2d 339, 344 (Pa. 2000). When both prongs are met, summary judgment is

4

warranted in favor of the ski resort "because, as a matter of law, [the plaintiff] cannot recover for her injuries." Id.

The PSRA "is unusual in its brevity and failure to give any definition of an 'inherent' risk of skiing," Chepkevich, 2 A.3d at 1188 n.15, so we turn to caselaw for guidance. The Pennsylvania Supreme Court has identified collisions with other skiers, "snow and ice, elevation, contour, speed and weather conditions," Hughes, 762 A.2d at 344, and falling from a ski lift, Chepkevich, 2 A.3d at 1188, as inherent risks. It has also instructed other courts to adopt "a practical and logical interpretation of what risks are inherent to the sport," id. at 1187–88, and explained that invocation of the PSRA does not require proof that the injured skier assumed the "specific risk" that caused injury — only that the injury arose from a "general risk" inherent to the sport, id. at 1188.

Applying this guidance, we conclude that the plaintiffs' action is barred by the PSRA. The plaintiffs do not dispute that the first prong — "engaged in the sport of downhill skiing," Hughes, 762 A.2d at 344 — is met. Only the "inherent risk" prong is at issue on appeal, and it is also satisfied.

The risk identified by the plaintiffs as causing Vu's injuries is skiing off of a trail edge that was three to four feet above the natural terrain, which we conclude is inherent to the sport of downhill skiing.[1] Cf. Smith-Wille v. Ski Shawnee, Inc., 35 Pa. D. & C. 5th 473, 475, 484 (Pa. Ct. Com. Pl. 2014) (holding, where a skier was injured after losing

---

[1] To the extent that the plaintiffs allege that Vu's injuries resulted from his attempt to avoid a collision with a snowboarder, we conclude that that risk is also inherent to downhill skiing. See Hughes, 762 A.2d at 345.

5

control on an icy slope and crashing into a fence running along the edge of a ski trail, that "[t]he edge of the ski slope . . . [is an] inherent risk[] of skiing," as is "[s]triking a protective fence designating and protecting skiers from the edge of the trail"). Not only does this risk appear to fall under the umbrella of elevation or contour (or both), which have been identified by Pennsylvania courts as inherent risks, Hughes, 762 A.2d at 344, but also other courts have recognized the more general risk of skiing off a trail as inherent to downhill skiing, see Nutbrown v. Mount Cranmore, Inc., 671 A.2d 548, 553 (N.H. 1996) (holding that when "the chief cause of [the plaintiff's] injuries" was the "quintessential risk . . . that a skier might lose control and ski off the trail," he "may not recover against a ski area operator for resulting injuries"); cf. Bjorgung, 550 F.3d at 265, 269 (holding that the PSRA barred a competitive skier's cause of action where he was injured after he skied into the woods off of a trail because the failure to set safety netting or "fix a race course in a way that minimizes the potential for the competitors to lose control" were inherent risks of ski racing).

Given "the clear legislative intent to preserve the assumption of the risk doctrine in this particular area, as well as the broad wording of the Act itself," the District Court correctly concluded that skiing over a slope edge and leaving the trail is an inherent risk of downhill skiing from which the defendants had no duty to protect Vu. Chepkevich, 2 A.3d at 1187. That is particularly true because Vu — who had been skiing for more than twenty years as of January 2015 and could ski black diamond, or the "most difficult," slopes, App. 908, 1025 — acknowledges "that downhill skiing is a dangerous, risk sport" and "that if he skied off trail, he could encounter trees[ and] rocks," App. 909, 911, 1025,

6

1027, and because Vu's daughter and Disotelle both testified that they had no trouble discerning the slope edge, and on trail from off trail, on January 23, 2015.

The plaintiffs unsuccessfully make four related arguments, which we briefly address. To begin, they make much of the fact that the elevation difference between the slope edge and the natural terrain "was not a naturally occurring condition" but rather the result of the defendants' grooming or making artificial snow. Vu Br. 5. This distinction is of no import for two reasons. First, the PSRA is concerned with the general, not the specific, risk that allegedly caused injury. Chepkevich, 2 A.3d at 1188. The general risk at issue is skiing over a slope edge (natural or not) and encountering off-trail conditions. Second, the PSRA bars recovery not only for injuries due to naturally occurring conditions, but also for injuries due to any "common, frequent, and expected" risk. Id. at 1186. Indeed, it has been invoked to preclude actions relating to PVC piping on a fence, Smith-Wille, 35 Pa. D. & C. 5th at 484, snowmaking equipment, Glasser v. Seven Springs Mountain Resort, 6 Pa. D. & C. 5th 25, 29 (Pa. Ct. Com. Pl. 2008), aff'd, 986 A.2d 1290 (Pa. Super. Ct. 2009), a ski lift, Chepkevich, 2 A.3d at 1188, and "wheel ruts on a ski slope created by an ATV," Kibler v. Blue Knob Recreation, Inc., 184 A.3d 974, 980–81 (Pa. Super. Ct. 2018). Although none of those causes of injury are naturally occurring conditions, they were all found to be inherent risks of downhill skiing.

Second, the plaintiffs contend that the "unguarded existence" of this slope made of artificial snow "is a deviation from the standard of care in the skiing industry," apparently attempting to invoke the exception to the no-duty rule explained in Jones v. Three Rivers Management Corp., 394 A.2d 546 (Pa. 1978). Vu Br. 14. Pursuant to Jones, although

7

sports facilities and amusement parks have no duty to protect against inherent risks, a plaintiff may recover from one such establishment for injury caused by an inherent risk if she "introduces adequate evidence that the amusement facility . . . deviated in some relevant respect from established custom." Jones, 394 A.2d at 550–51. The plaintiffs have not provided support for this assertion beyond their expert's report,[2] which does not clearly identify any industry standard from which the defendants are supposed to have deviated, but instead merely asserts that they violated generally accepted practices within the industry.[3]

Third, the plaintiffs seem to assert that the District Court improperly resolved a disputed issue of material fact in the defendants' favor because reasonable jurors could disagree whether a slope edge with a three to four-foot elevation difference is an inherent risk. We reject this argument because the record citation provided does not support the plaintiffs' contention, and the cases upon which the plaintiffs rely are inapposite, one involving the application of Vermont law and the other (predating Hughes and Chepkevich) applying a no-duty standard different from the standard espoused in those two cases.

---

[2] The defendants argue that the expert report is unsworn and therefore may not be considered on a motion for summary judgment. Given our conclusion, we need not address this contention.

[3] The plaintiffs also point to evidence of "other skiers being injured at [Liberty Mountain Resort] in the exact same manner" on other slopes during previous seasons. Vu Br. 11–12. Such evidence does not identify any industry custom or Liberty Mountain Resort's deviation from it.

Fourth, the plaintiffs also contend that the legislative intent behind the PSRA could not have been to encourage "the creation of artificial, Defendant-made 'cliffs' along . . . trail edges." Vu Br. 6. For all of the reasons already discussed, we reject this argument as well.

In sum, we conclude that the plaintiffs' injuries were caused by risks inherent to downhill skiing, satisfying the second prong of the Hughes test. Because it is undisputed that Vu was "engaged in the sport of downhill skiing at the time of [his] injur[ies]," the first prong is also met, such that summary judgment in favor of the defendants was properly granted. Hughes, 762 A.2d at 344.

IV.

For the aforementioned reasons, we will affirm the judgment of the District Court.